UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CDM MEDIA USA, INC., | |
| Plaintiff, | |
| | No. 14 CV 9111 |
| v. | |
| | Judge Manish S. Shah |
| ROBERT SIMMS, | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff CDM Media USA has sued its former employee, defendant Robert Simms, for refusing to transfer control of a LinkedIn group the company says it owns. Plaintiff also alleges that defendant wrongfully held onto the company's confidential information after he left the company, which he used in competition with his former employer.

In a three-count amended complaint, plaintiff claims defendant's conduct constituted breach of contract, violation of the Illinois Trade Secrets Act, and common law misappropriation. Defendant has moved under Rule 12(b)(6) to dismiss the complaint in its entirety for failure to state a claim. For the following reasons, defendant's motion is granted in-part and denied in-part.

**I.  Legal Standard**

"A motion under Rule 12(b)(6) tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). Under Rule 8(a)(2), a complaint must include "a short and plain statement of

the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation omitted). In reviewing the sufficiency of a complaint, a court accepts the well-pleaded facts as true. *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665-66 (7th Cir. 2013).

## II. Background

Plaintiff CDM Media USA, Inc. offers a variety of marketing and media services to its customers [1-1][1] ¶ 8. "A crucial part of CDM's business lies in its contacts and the channels and methods for communicating with its clients and prospective clients and developing products and services for those clients and prospective clients." *Id.* ¶ 11. As a result, CDM must "constantly develop new and innovative ways to market itself and its services and communicate with its customers and its potential customers . . . ." *Id.* ¶ 12.

Defendant Robert Simms worked for CDM from June 2009 until July 2014. *Id.* ¶ 13. At the time he began working for plaintiff, defendant agreed to abide by the company's employee handbook. *Id.* ¶ 21. Among other things, the handbook instructed defendant to keep certain of plaintiff's information confidential and to return plaintiff's property when he left the company. *Id.* In March 2013, defendant also entered into a non-compete agreement with plaintiff, which (1) required defendant to return plaintiff's confidential information upon leaving the company,

---

[1] Citations to [1-1] refer only to the amended complaint contained in that document.

(2) prohibited defendant from competing with CDM for one year following his departure, and (3) assigned defendant's inventions to the company. *Id.* ¶¶ 24-26.

As part of the senior management team, defendant had access to "confidential and restricted-access CDM materials including vendor and customer lists and pricing and cost data." *Id.* ¶ 14. For instance, defendant had access to plaintiff's Event Logistic Management database, in which the company stored some of its "most sensitive information, including CDM vendor and customer lists, pricing and cost data regarding its products and services, profit and loss information, etc." *Id.* ¶ 29. Access to this database was restricted and only a small number of senior management had complete access. *Id.* ¶ 31.

In the spring of 2010, CDM launched a LinkedIn group called "the CIO Speaker Bureau," a private online community of chief information officers and senior IT executives interested in participating in or speaking at CDM events. *Id.* ¶ 15. The names of Bureau members and the communications between members were not generally available to the public at large. *Id.* ¶ 16. Membership in the Bureau was controlled by CDM. *Id.* ¶ 17. Defendant was made CDM's point person for this LinkedIn group, as well as for the other online communities CDM used in connection with its business. *Id.* ¶ 18. By the time defendant left CDM, membership in the Bureau had grown to about 679 members. *Id.* ¶ 20. Plaintiff alleges that "the Bureau and all rights therein or in connection therewith was at all times the property of CDM." *Id.* ¶ 48.

Defendant resigned from CDM in July 2014 and began working for one of plaintiff's larger customers, a company called Box. *Id*. ¶¶ 38, 40. Plaintiff asked defendant to complete paperwork changing the contacts for the social media accounts he had used in his work for CDM. *Id*. ¶ 49. Although defendant made the changes for the other social media accounts, he refused to do it for the Speaker Bureau LinkedIn group. *Id*. ¶ 50. Defendant likewise "refused to return the Bureau membership list and Bureau communications," and he later used the materials "to compete against CDM by soliciting customers and vendors and potential customers and vendors for competitive products and services in further violation of his Non-Compete." *Id*. ¶¶ 50, 52. Three customers advised plaintiff that defendant had "solicited them in violation of his Non-Compete." *Id*. ¶ 44.

Plaintiff also asked defendant to return any confidential information or other company property in his possession. *Id*. ¶ 53. Although defendant told plaintiff he had nothing of the like, plaintiff's subsequent internal investigation revealed that defendant had been using a personal cell phone to access the ELM database, and he did not return the data stored on his phone. *Id*. ¶ 57.

Plaintiff filed a three-count complaint in state court, which defendant removed to this court under 28 U.S.C. §§ 1332(a)(2) and 1446.[2] Plaintiff seeks relief based on theories of breach of contract, violation of the Illinois Trade Secrets Act (765 ILCS 1065/1 *et seq*.), and common law misappropriation. Defendant has moved

---

[2] Plaintiff is an Illinois corporation and defendant is a resident and citizen of Great Britain.

4

under Federal Rule of Civil Procedure 12(b)(6) to dismiss each of plaintiff's three claims.

## III. Analysis

### A. Count I – Breach of Contract

"Under Illinois law, a plaintiff looking to state a colorable breach of contract claim must allege four elements: '(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages.'" *Reger Development, LLC v. National City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (quoting *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 351 Ill. App. 3d 752, 759 (1st Dist. 2004)). In this case, plaintiff claims defendant breached his employment contract by (1) working for Box, (2) soliciting plaintiff's customers, (3) failing to transfer control of the LinkedIn group, and (4) failing to return the contents of his personal cell phone. Plaintiff believes the agreement defendant breached consisted of both the CDM Employee Handbook and the non-compete.

#### 1. "The existence of a valid and enforceable contract"

Defendant argues that Count I should be dismissed because plaintiff has not alleged a valid and enforceable contract. This argument is plainly incorrect with regard to the non-compete, a signed copy of which defendant attached to his brief (and which plaintiff referenced in the complaint). Defendant's argument has more merit, however, as concerns the CDM Employee Handbook. The signed non-compete

5

makes clear that no other agreement governed the parties' relationship ([13-3] ¶ 5.3):

> Employee acknowledges and agrees that his or her employment with the Company exists solely at the will of either party and may be terminated by either at any time without notice and with or without cause. Employee likewise acknowledges and agrees that any employee handbooks or policies and procedures of the Company are strictly guidelines and do not constitute a contract between the Company and the Employee. No employee or representative of the Company has any authority to enter into any agreement contrary to the foregoing.

Although plaintiff alleges that defendant "agreed to follow the CDM employee handbook," [1-1] ¶ 21, this allegation does not plausibly support a breach of contract claim in light of the non-compete's explicit terms. And to the extent the handbook was an enforceable contract when defendant started, the parties altered that agreement when they entered into the non-compete.

## 2. "Substantial performance by the plaintiff"

The non-compete does not place any affirmative obligations on plaintiff, other than the implicit obligation to pay defendant. Along these lines, paragraph 28 explicitly states that "[i]n consideration for the Non-Compete, [defendant] enjoyed continued employment with [plaintiff] and also received a car allowance." *Id.* ¶ 28. This adequately alleges substantial performance by plaintiff.

## 3. "A breach by the defendant"

Defendant argues that plaintiff failed to allege a breach of § 2.2 ("Noncompetition") or § 2.3 ("Customers") of the non-compete. He first contends that plaintiff has not alleged a breach of either section because the two provisions regulate defendant's activity with regard to plaintiff's competitors not customers.

6

This argument stems from the allegation that Box was one of plaintiff's "larger customers." [1-1] ¶ 40. But simply because Box was once plaintiff's customer does not mean it could not have become its competitor. If a customer wanted to enter into a new market and start competing with its former vendor, a logical first step might be to hire the vendor's employees. Plaintiff's allegation that defendant has been competing for CDM's customers while at Box is therefore plausible. *Id.* ¶¶ 2, 44-46.

Defendant next argues that the complaint fails to allege he performed services for Box that were—as § 2.2 proscribes—"substantially similar to the services he or she performed for" CDM. To be sure, the complaint does not contain many details about the nature of defendant's work for Box. But, construing the pleadings in the light most favorable to plaintiff, the claim that defendant's new job is "substantially similarly" to his old one can be reasonably inferred from the allegations that (1) defendant was partly responsible for business development at CDM, (2) he now works for plaintiff's (former) customer where he competes for plaintiff's current customers, and (3) he has been using CDM's property and confidential information in furtherance of that competition. Accordingly, I cannot say as a matter of law that defendant is not performing services for Box that are substantially similar to what he was doing at CDM.

Defendant next argues that, contrary to plaintiff's claim, he was under no duty to remit his personal cell phone when he left CDM. While true the complaint demonstrates no such specific duty, that is not what plaintiff actually claims. Instead, the company contends that defendant took data from the ELM database,

7

stored it on his personal phone, and then failed to return the data upon his departure. Although defendant allegedly told plaintiff that he "did not have any confidential information or property in his possession," [1-1] ¶ 53, plaintiff clearly alleges that this representation was false. Accepting plaintiff's allegation as true, defendant's retention of plaintiff's data constituted a breach of § 1.1 of the non-compete ("Return of Data").

Finally, defendant argues that his alleged failure to transfer control of the LinkedIn group could not have violated § 1.1 because the group does not "contain[] or relate[] to Confidential Information." At this early stage of the litigation, however, I cannot conclude whether or not control of the Speaker Bureau falls within the scope of § 1.1. For example, plaintiff alleges that defendant refused to return "Bureau communications." If these communications were private messages between the members and plaintiff, which is reasonable to infer, they likely would fall within § 1.1.

On Count I, defendant's motion is granted as to all claims premised on the CDM Employee Handbook, and denied as to the others.

B.  **Count II – Illinois Trade Secrets Act**

To state a claim under the Illinois Trade Secrets Act, a plaintiff must allege (1) the existence of a trade secret, (2) misappropriation of that trade secret, and (3) that the trade secret was used in the defendant's business. *See Strata Marketing, Inc. v. Murphy*, 317 Ill. App. 3d 1054, 1068 (1st Dist. 2000). The Illinois Trade Secrets Act defines "trade secret" as:

8

> [I]nformation, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2(d). In addition to this statutory definition, Illinois courts have identified six common-law factors relevant to evaluating whether information qualifies as a trade secret:

> (1) the extent to which the information is known outside the employer's business, (2) the extent to which it is known by employees and others involved in the business, (3) the extent of the measures taken by the employer to guard the secrecy of the information, (4) the value of the information to the employer and to his or her competitors, (5) the amount of effort or money expended by the employer in developing the information, and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Stenstrom Petroleum Services Group, Inc. v. Mesch*, 375 Ill. App. 3d 1077, 1090 (2d Dist. 2007). In this case, the alleged trade secrets are (1) the Speaker Bureau's membership list, (2) the "confidential information contained" in the LinkedIn group (e.g., "private communications"), and (3) the contents of the ELM database. [1-1] ¶ 67.

### 1. Speakers Bureau Membership List

Defendant believes Count II should be dismissed because the Speakers Bureau LinkedIn group is not secret. Defendant points out that plaintiff announced its creation through a press release. This argument is a non-starter, however, because plaintiff does not claim the group's existence to be secret—only its contents.

9

More generally, too little is known about the contents, configuration, and function of the LinkedIn group at this time, to conclude as a matter of law that its list of members did not constitute a trade secret. Plaintiff alleges that the group contained the names of 679 current or potential customers, which information "would be extremely valuable to competitors of CDM" because these members "would be good candidates for some of the services and products offered by CDM and/or good partners . . . ." *Id.* ¶ 72. The complaint states that the "Bureau was developed over 4 years by CDM through great expenditures of time, cost and effort . . . ." *Id.* ¶ 74. Plaintiff further alleges that "privacy setting[s] . . . limited access to the Bureau online community." *Id.* ¶ 69.

Defendant disagrees with plaintiff's characterization. He cites LinkedIn's "About Page," its terms, and its conditions. Defendant also invites the court to visit the Speaker Bureau's page on LinkedIn. Defendant cites no authority for the proposition, however, that judicial notice of any of these materials, or consideration of the information they contain, is appropriate at this stage on a motion to dismiss where the complaint plausibly alleges that the membership list was a valuable secret commodity. Defendant's evidence merely raises a factual issue that cannot be resolved now.

On Count II, the motion is denied as to the Speaker Bureau membership list.

### 2. "Confidential Information"

Plaintiff's complaint gives little sense of what "confidential information" is contained in the LinkedIn group other than saying there are "private

communications" about "the IT industry and the members' business needs and desires." *Id.* ¶ 72. While a private communication can contain a trade secret, it is not itself a trade secret. It is therefore insufficient for plaintiff to allege that the LinkedIn group's private communications were trade secrets under the Illinois Act. Plaintiff must allege that certain messages—or at least classes of messages—contained trade secrets, setting forth what it is about the messages that plausibly satisfies the applicable definitions. For example, plaintiff must allege facts supporting the inference that a message from a company sharing its business needs is somehow CDM's secret.

On Count II, the motion is granted as to the "confidential information" contained in the Speaker Bureau group.

### 3. ELM Database

Defendant says Count II should be dismissed because plaintiff does not allege that defendant had access to the ELM database after he left the company. This argument is not persuasive, however, because—as already noted—that is not plaintiff's claim. Instead, CDM alleges that defendant downloaded data from the ELM database onto his personal phone and failed to return that data when leaving.

Nevertheless, this trade-secrets claim fails because plaintiff does not allege that defendant actually used the data from the ELM database in his business. Although plaintiff claims in its brief that it did so allege, nothing in the paragraphs it cites (¶¶ 44-47) supports the inference that defendant used the ELM data to

solicit any customers. Instead, plaintiff acknowledges that "Simms had contact with [the customers he allegedly solicited] while he was employed by CDM." [1-1] ¶ 46.

The parties also debate whether the "inevitable disclosure doctrine" is satisfied in this case. Under that rule, a plaintiff may bring a trade-secrets claim—even if the trade secret has not yet been used—if the defendant "could not operate or function without relying on [plaintiff's] alleged trade secret." *Strata Marketing*, 317 Ill. App. 3d at 1070. Plaintiff believes its complaint states a claim under this theory and it cites paragraphs 73 and 75 in support. These paragraphs are insufficient, however. Paragraph 73 merely describes how valuable the data in the ELM database was, while paragraph 75 asserts only that:

> Given Simm's position and responsibilities while he was at CDM, given his access to restricted and sensitive data while at CDM and given his activities after leaving CDM, further disclosures of CDM trade secrets and confidential information are so threatened that it is inevitable that Simms will disclose other confidential information and trade secrets belonging to CDM.

This sole paragraph is far too vague and conclusory to do all the work of stating a claim under the inevitable disclosure doctrine. Plaintiff argues that this allegation is "nearly identical to the allegations found to be sufficient" in *Strata Marketing*, but a review of that decision demonstrates that its allegations were vastly more specific about which information would inevitably be disclosed. *See* 317 Ill. App. 3d at 1070-71.

On Count II, the motion is granted as to the ELM database.

## C. Count III – Common Law Misappropriation

Defendant argues that Count III should be dismissed because the Illinois Trade Secrets Act preempts it. *See* 765 ILCS 1065/8(a) ("this Act is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret."). Plaintiff's response is that it brings Count III, which does not depend on the information being confidential, as an alternative to Counts I and II. The Seventh Circuit has recognized that the Illinois Trade Secrets Act's preemptive reach does not "apply to duties imposed by law that are not dependent upon the existence of competitively significant secret information." *Hecny Transportation, Inc. v. Chu*, 430 F.3d 402, 405 (7th Cir. 2005). The contours of common law misappropriation are far from clear in Illinois. But the tort has its genesis in *International News Service v. Associated Press*, 248 U.S. 215 (1918), which involved the misappropriation of "hot news"—not "competitively significant secret information." Similarly, in *Capitol Records, Inc. v. Spies*, 130 Ill. App. 2d 429 (1st Dist. 1970), the cause of action was applied to a case involving the sale of unauthorized recordings of music albums—again, not a situation involving "competitively significant secret information." It would appear, therefore, that like the torts of conversion, theft, and breach of fiduciary duty, the tort of common law misappropriation is not necessarily preempted by the Illinois Trade Secrets Act since it does not depend on secret information.

Plaintiff's Count III is quite brief, but it does distinguish itself from Counts I and II through its lack of reference to confidential or secret information. Unlike defendant's cited case, *Holman v. Indiana*, 211 F.3d 399 (7th Cir. 2000), it is therefore reasonable to read Count III as constituting an alternative theory of liability.

On Count III, defendant's motion to dismiss is denied.

## IV.     Conclusion

Defendant's motion to dismiss [13] is granted in-part and denied-in part.


ENTER:

                                                  Manish S. Shah
                                                  United States District Judge

Date: 3/25/15